IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

 Plaintiff,

vs.

UNITED STATES OLYMPIC COMMITTEE,

 Defendant.

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Philadelphia Indemnity Insurance Company, by and through its attorneys, the law firm of Lambdin & Chaney, LLP, and for its Complaint against the United States Olympic Committee, alleges as follows:

### I. JURISDICTION AND PARTIES

1. Plaintiff Philadelphia Indemnity Insurance Company ("PIIC") is a Pennsylvania corporation with its principal place of business in Pennsylvania.

2. Defendant United States Olympic Committee ("USOC") was incorporated by An Act of the United States Congress, Public Law 95-606 on November 8, 1978.

3. As represented in its filings with the Colorado Secretary of State, the principal offices for the USOC are located at One Olympia Plaza, Colorado Springs, Colorado 80909.

653017.1

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 36 U.S.C. § 220505(b)(9), which provides that the USOC may sue or be sued in any federal district court.

5. Plaintiff is of diverse citizenship from the Defendant. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332, $75,000.

6. Declaratory relief is authorized and appropriate in this action and all necessary parties are before the Court pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201.

7. An actual controversy exists between the parties regarding coverage afforded under the insurance policies identified herein.

8. The controversy is justiciable in character, and the relief requested herein is necessary to declare the parties' contractual rights, duties, and obligations.

9. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this controversy occurred in this District. The policies at issue were negotiated and entered into in Colorado, and were issued in Colorado to a named insured with its principal place of business in Colorado.

## II. FACTUAL BACKGROUND

10. PIIC incorporates by reference the allegations contained in all preceding paragraphs as if set forth fully herein.

### A. The Applications for Insurance and the PIIC Policies:

11. This case involves two policies issued by PIIC to the USOC, specifically PHPK1330247 and PHUB498238, that were in force from May 1, 2015 to May 1, 2016.

12. The United States Paralympic Corporation is included as a Named Insured.

13. Policy PHPK1330247 is a Commercial Lines Policy that includes a Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form with an Each Abusive Conduct Limit of $1,000,000 subject to an Aggregate Limit of $2,000,000, attached as ***Exhibit 1***.

14. Policy PHUB498238 is also a Commercial Lines Policy that provides umbrella coverage through a Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form Sublimit in the amount of $10,000,000 for Each Abusive Conduct subject to an $10,000,000 Aggregate Limit, attached as ***Exhibit 2.***

15. When applying for insurance with PIIC, the USOC answered as follows on an Application signed on March 11, 2015, attached as ***Exhibit 3***:

> 9. Has your organization ever had an incident which resulted in an allegation of sexual abuse? ☐ Yes ☑ No
> If yes, please describe.
> Based on the USOC's understanding of appropriate definitions of sexual abuse, there have been no incidents.
>
> 10. Was a claim made against the organization? N/A ☐ Yes ☐ No

16. The USOC, through its Director of Risk Management Eric Marsh, provided the following warranty as to the statements and representations made in the Application:

> **WARRANTY INFORMATION:**
>
> 1. With respect to this coverage, has any Underwriter refused, canceled, or non-renewed coverage? (Not Applicable in Missouri) ☐ Yes ☑ No
> If yes, please provide details:
>
> 2. As of this date, or the date on which the Applicant first applied for prior similar coverage and has maintained such prior similar coverage continuously in force, no person applying for this coverage is/was aware of any facts or circumstances which he or she has reason to suppose might give rise To a future claim that would fall within the scope of any of the proposed coverages for which the Applicant has applied, except: None ☑ or as noted below:

> With regard to Questions 2. and 3., it is understood and agreed that if any such claim, act, error, omission, dispute or circumstance exists, then such claim and/or claims arising from such act, error, omission, dispute or circumstance is excluded from coverage that may be provided under this proposed insurance, and, further, failure to disclose such claim, act, error, omission, dispute or circumstance may result in the proposed insurance being void and/or subject to rescission.
>
> The Undersigned warrants that to the best of his/her knowledge and belief the statements set forth herein are true. The Undersigned further declares that any occurrence or event that takes place prior to the effective date of the insurance applied for which may render inaccurate, untrue, or incomplete any statement made will immediately be reported in writing to the Underwriter. The Underwriter may withdraw or modify any outstanding quotations and / or authorization or agreement to bind the insurance. The Underwriter is hereby authorized to make any investigation and inquiry in connection with the information, statements, and disclosures provided in this Application. The signing of this Application does not bind the Undersigned to purchase the insurance, nor does the review of this Application bind the insurance company to issue a policy. It is agreed that this Application shall be the basis of the contract should a policy be issued. This Application will be attached and become a part of the policy.
>
> _Eric Marsh_                        _Dir. Risk Mgt_
> NAME (Please Print)         TITLE (~~MUST BE SIGNED BY THE PRESIDENT, CHAIRMAN, CEO OR EXECUTIVE DIRECTOR~~)
>
> _[signature]_                          _3-11-15_
> SIGNATURE                      DATE
>
> The above signed warrants that he/she is authorized and has the power to complete and execute this Application, including the Warranty Statement on behalf of the Applicant and their respective Directors, Officers or other insured persons.

17.  Due to underwriting requirements, the USOC had to resubmit an Application, which it did on September 25, 2015, attached as **Exhibit 4**, and again answered as follows on the second Application:

> 8. Has the Applicant ever had as incident which resulted in an allegation of sexual abuse?   ☐ Yes ☑ No
>    If yes, please describe.
>    Based on USOC's understanding of appropriate definitions of sexual abuse, there have been no incidents.

18.  In submitting these Applications, the USOC warranted that it had never had an incident which resulted in an allegation of sexual abuse.

19.  By signing the Application, the USOC warranted that it was not aware of any facts or circumstances that might give rise to a future claim and acknowledged that a "failure to disclose such claim, act, error, omission, dispute or circumstance may result in the proposed insurance being void and/or subject to rescission."

20. The Application provides PIIC with the right to make any investigation and inquiry in connection with the information, statements, and disclosures provided in the Application.

21. The Application provides that it is a part of the policy.

**B.      The USOC's Knowledge When the Applications were Submitted**

22. Because of documented widespread instances of sexual abuse, the Energy and Commerce Committee in the United States Senate opened an investigation into sexual abuse in organized sport, culminating in its final report issued on December 20, 2018, which is attached as ***Exhibit 5***.

23. According to the Committee's final report, there have been reports of sexual abuse within the Olympic community for more than three decades.  *See Memo submitted to Congressional committee, attached as **Exhibit 6***.

24. 36 U.S.C. § 220501-3 establishes the USOC as the coordinating body for all Olympic-related activity in the U.S. and gives the USOC exclusive jurisdiction, directly or through constituent members or committees, over all matters pertaining to United States participation in the Olympic Games, the Paralympic Games and the Pan-American Games, including representation of the United States in the games.

25. The USOC provides National Governing Boards ("NGBs") with governance support, and in some instances, the USOC has required changes to a NGBs bylaws related to the Act or the USOC's bylaws.  *See Letter from Counsel to the USOC, to Staff H. Comm. On Energy and Commerce (May 16, 2018) attached as **Exhibit 7.***

26. The USOC has placed NGBs on probation and/or discussed decertification with other NGBs.

27. As testified to by USOC former CEO Scott Blackmun, as a result of reported abuse in 2010 following the Paralympic Winter Games, the USOC formed a Working Group for Safe Training Environments to develop a set of recommendations for consideration by the USOC Board of Directors. The Working Group presented its recommendations to the USOC Board in September 2010.

28. In addition to presenting six key areas identified by the Working Group, the USOC Board of Directors meeting minutes state that the Group "determined that the issue of sexual abuse is very real in sport and that a call to action is needed."

29. As a result, the USOC adopted a SafeSport Handbook in 2012, created a minimum standards policy, and required each NGB to adopt an athlete safety program by December 31, 2013.

30. In response to Committee questions, almost half of the NGBs reported that in certain, and in some cases all, instances they communicated, and occasionally consulted with the USOC in the event of a report, complaint, or allegation of sexual abuse.

<u>Taekwondo</u>

31. Prior to 2015, both USA Taekwondo (USAT) and the USOC had been aware of sexual assault allegations against USAT Coach Marc Gitelman.

32. Yasmin Brown sent a packet of documents that circulated through the USOC headquarters in early 2014, which included letters from two other women alleging abuse by Gitelman, and a police report.

33. Gitelman's sexual abuse of the minor female athletes occurred at various locations, including at the USOC's Olympic Training Center in Colorado Springs.

34. In March 2014, USAT board member Ronda Sweet emailed the evidence against Gitelman to several USOC officials, including Director of Ethics and SafeSport Malia Arrington (whose job CEO Blackmun created in 2011 after the USA Swimming abuse scandal), and its Associate General Counsel Gary Johansen. *See email with police report attached as **Exhibit 8.***

35. In a March 10, 2014 email regarding the allegations, then-USOC board member Susanne Lyons wrote: "Here we go again. This sounds like the same old BS . . . Allowing a sexual predator to continue to coach without having an appropriate investigation and conclusion is unacceptable." *See Susanne Lyons email attached as **Exhibit 9.***

Speedskating

36. In March 2013, US Speedskating announced its investigation of sexual misconduct charges against Andy Gabel, who was a three-time Olympian and US Speedskating's president from 2002 to 2006.

37. Among those he abused was Bridie Farrell.

38. In testimony before the United States Senate committee, Bridie Farrell testified *inter alia* as follows, attached as ***Exhibit 10***:

- Farrell disclosed her sexual abuse to the USOC on February 28, 2013.

- In response, Mr. Blackmun with the USOC made a statement to the Chicago Tribune in 2013, stating that "we have a duty to do everything we can to protect our children from abuse at the hands of adults."

- Farrell met with Mr. Blackmun, CEO of the USOC, and he asked that she direct athletes to report to him and not to the media.

653017.1                             7

### Archery

39.     USA Archery has had 6 complaints and/or allegations of sexual abuse.  *See Response from USA Archery to Committee Questions attached as **Exhibit 11***.

40.     Three of those six cases were shared or discussed with the USOC.

41.     One of the cases in which the USOC was notified, involved sexual misconduct at the USOC's Olympic Training Center in Chula Vista, California.

42.     Those communications occurred before the Center for SafeSport was formally established.

### Curling

43.     USA Curling received complaints of sexual abuse in 2012 and 2013.  *See Response from USA Curling to Committee Questions attached as **Exhibit 12.***

44.     Prior to the opening of the Center in 2017, USA Curling had a practice of keeping an open dialogue with the USOC in regard to SafeSport complaints.

### Field Hockey

45.     USA Field Hockey had a reported incident of sexual abuse in 2013, which resulted in membership ban for life.  *See Response from USA Field Hockey to Committee Questions attached as **Exhibit 13***.

46.     It was reported to the USOC's SafeSport Committee.

### USA Karate

47.     USA Karate had sexual abuse allegations in 2005 and 2010.  *See Response from USA Karate to Committee Questions attached as **Exhibit 14***.

48. In 2010, USA Karate was made aware that a member had been arrested for sexual abuse. The member was suspended pending the outcome of the legal proceedings. Upon his criminal conviction, he was permanently banned.

49. USA Karate sought guidance from the USOC and has always advised the USOC of the cases that it has had.

Rowing

50. US Rowing had a case of sexual abuse in 2014, and the USOC was notified. *See Response from US Rowing to Committee Questions attached as **Exhibit 15***.

Rugby

51. USA Rugby had two reported incidents in 2014, one of which went through a full hearing and resulted in a lifetime ban after being found guilty of statutory rape. *See Response from USA Rugby to Committee Questions attached as **Exhibit 16***.

52. Since joining the USOC in 2009, USA Rugby has reported incidents of sexual abuse to the USOC through the SafeSport program.

Ski & Snowboard

53. US Ski & Snowboard received six complaints of sexual abuse from 2007 through 2014. *See Response from US SKI to Committee Questions attached as **Exhibit 17***.

54. Four of those complaints received in 2014, were reported to the USOC.

Gymnastics

55. USOC is currently facing numerous lawsuits filed by gymnasts who allege they were sexually abused by Dr. Larry Nassar, who had been employed by USA

Gymnastics ("USAG") as a team doctor from approximately 1986 to mid-2015. Dr. Nassar was criminally convicted in February 2018 after a very public sentencing hearing wherein 156 women testified against him. Nearly all of the pending lawsuits contend the USOC long had knowledge of claims of abuse against Dr. Nassar, but failed to act to protect the athletes.

<u>USOC's Testimony and Response to Committee Questions</u>

56. The U.S. Paralympics is a division of the USOC. *See Response from the USOC to Committee Questions attached as **Exhibit 7***.

57. With respect to Paralympic sports organizations internal to the Olympic Committee, the Olympic Committee's records indicate that it addressed sexual abuse related SafeSport complaints in 2010 and 2011, which were referred to law enforcement.

58. The Olympic Committee also collected and tracked safety data regarding its Olympic Training Facilities at Colorado Springs and Lake Placid.

59. At the time the USOC submitted the Applications to PIIC, its Chief Executive Officer was Scott Blackmun.

60. In a statement provided on June 5, 2018, to a United States Senate subcommittee, USOC CEO Blackmun stated *inter alia*, attached as **Exhibit 18**:

- From 1992 to 1998, Blackmun represented the USOC on commercial matters as a lawyer in private practice.

- From 1999 through 2001, Blackmun was employed by the USOC in a variety of capacities, including general counsel, deputy executive director, chief of sport and acting executive director.

- From January 2010 through February 2018, Blackmun served as the CEO of the USOC.

- After the 2010 Paralympic Winter Games, there were reports of coaches abusing athletes in swimming.

- In the spring of 2010, Blackmun formed a working group to develop recommendations regarding sexual and other abuse in sports.

- The working group presented its 21-page report to the USOC's board of directors on September 28, 2010.

- The Dr. Nassar situation was first brought to Blackmun's attention in July 2015, via phone call from Steve Penny, who was then the CEO of USAG.

### C.     Policy Language and Defense of Underlying Lawsuits

61.     The Sexual or Physical Abuse or Molestation (SPAM) Vicarious Liability Coverage Form provides:

> **2.     Duties In the Event of an Incident, Claim or Suit**
>
> b.     You and any other involved insured must:
>
> (2)     Authorize us to obtain records and other information;
>
> (3)     Cooperate with us in the investigation, settlement or defense of the claim or "suit" including the release of any personnel records of the person(s) allegedly involved in the abusive conduct; and
>
> **6.     Representations**
>
> By accepting this policy, the insured agrees:
>
> a.     the statements in the Declarations, and in the application for insurance are accurate and complete;
>
> b.     those statements are based upon representations made the insured; and
>
> c.     [PIIC] issued [the] policy in reliance upon those representations.

62.     PIIC's decision to issue the policies was made in reliance on the USOC's representations and it would not have issued the policies if it had truthful information.

63. PIIC seeks to rescind the policies by returning the $130,445.00 premium paid for policy number PHPK1330247, and $27,760.00 premium paid for policy number PHUB498238.

64. In a letter dated December 4, 2018, attached as **Exhibit 19**, PIIC, through its counsel, agreed to participate in the defense of the USOC in 26 separate lawsuits (Underlying Lawsuits) concerning abuse by Dr. Nassar filed throughout the United States, subject to the "Other Insurance" provisions of other policies providing the USOC with a defense and also subject to a full and complete reservation of rights.

65. In a letter dated January 23, 2019, attached as **Exhibit 20**, PIIC, through its counsel, agreed to participate in the defense of the USOC in 2 additional lawsuits concerning Dr. Nassar (Underlying Lawsuits) filed in Los Angeles County, California, subject to the "Other Insurance" provisions of other policies providing the USOC with a defense and also subject to a full and complete reservation of rights.

66. In a letter dated March 25, 2019, attached as **Exhibit 21**, PIIC, through its counsel, agreed to participate in the defense of the USOC in 5 additional lawsuits concerning Dr. Nassar (Underlying Lawsuits), subject to the "Other Insurance" provisions of other policies providing the USOC with a defense and also subject to a full and complete reservation of rights.

67. PIIC anticipates that additional complaints will be tendered to it for a defense by the USOC concerning abuse perpetrated by Dr. Nassar (such future and additional lawsuits will be included as "Underlying Lawsuits").

68. Alternatively, PIIC seeks to void the coverages under the policies for breach of the policy provisions in that the USOC has refused to provide requested documents and information as part of PIIC's investigation into the representations made in the applications submitted to procure the policies.

69. The USOC has also refused and/or failed to provide copies of its liability policies with other insurers.

### III.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment to Rescind and/or Void the Policies)**

70. PIIC incorporates all the preceding paragraphs as if fully set forth herein.

71. PIIC seeks declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.*, and Fed. R. Civ. P. 57, on the following points:

   a. That PIIC is entitled to rescind and/or void the Policies;

   b. That no defense or indemnity is owed under the Policies for any of the Underlying Lawsuits.

72. In requesting this declaratory relief, PIIC is requesting an interpretation of the rights, legal status, and legal relations of the Parties pursuant to the above law and facts.

73. Requesting such an interpretation, and the Court thereafter providing such an interpretation, is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. § 2201 *et seq.*, and Fed. R. Civ. P. 57.

**SECOND CLAIM FOR RELIEF**
**(Rescission)**

74. PIIC incorporates all the preceding paragraphs as if fully set forth herein.

75. In completing the Applications, the USOC made a false statement(s) or concealed a fact(s).

76. The USOC made the false statement(s) or concealed the fact(s) knowingly.

77. The false statement(s) or concealed fact(s) was material to the issuance of the policy or the risk undertaken by PIIC.

78. PIIC had no knowledge of the false statement(s) or concealed fact(s) and is not chargeable with knowledge.

79. PIIC relied to its detriment on the false statement(s) or concealed fact(s) in issuing the insurance policy.

80. PIIC seeks to rescind the policies by returning the $130,445.00 premium paid for policy number PHPK1330247, and $27,760.00 premium paid for policy number PHUB498238.

81. PIIC's reliance caused it to suffer damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Fraudulent Concealment)

82. PIIC incorporates all the preceding paragraphs as if fully set forth herein.

83. In completing the Applications, the USOC fraudulently concealed one or more material facts.

84. The USOC concealed material facts with the intent of creating a false impression of the actual facts in the mind of PIIC.

85. The USOC concealed material facts with the intent that PIIC take a course of action – namely, issue liability insurance to cover sexual or physical abuse or molestation – that it would not have taken if PIIC had known the actual facts.

86. PIIC issued the policies to the USOC on the assumption that the concealed facts did not exist or that the concealed facts were different from the actual facts.

87. PIIC's reliance was justified.

88. PIIC's reliance caused it to suffer damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

89. At all times, PIIC performed its obligations under the policies or its performance is excused due to the USOC's breach and misrepresentations.

90. As outlined in the above allegations, the USOC has breached its obligations to has refused to provide requested documents and information as part of PIIC's investigation into the representations made in the applications submitted to procure the policies and has further refused and/ failed to provide copies of all liability policies with other insurers.

91. PIIC is discharged from any obligations under the policies.

92. As a result of the USOC's breach, PIIC has incurred damages in an amount to be proven at trial.

WHEREFORE, PIIC respectfully requests the Court enter Judgment in its favor, awarding all recoverable damages including attorney's fees and costs, as well as pre and post judgment interest on any amount awarded and granting such other and further relief as the Court deems just and proper under the circumstances.

**PLAINTIFF DEMANDS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

DATED this 26th of April, 2019.

s/ *L. Kathleen Chaney*
L. Kathleen Chaney, Esq.
LAMBDIN & CHANEY, LLP
4949 South Syracuse Street, Suite 600
Denver, CO 80237
(303) 799-8889
(303) 799-3700 (facsimile)
Email: kchaney@lclaw.net
*Attorneys for Plaintiff Philadelphia Indemnity Insurance Company*

Plaintiff's Address:

One Bala Plaza
Suite 100
Bala Cynwyd, PA 19004